UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

TEAMSTERS "GENERAL" LOCAL UNION
NO. 200,

       Plaintiff,

       v.                                         Case No.  11-C-0195

ROUNDY'S SUPERMARKETS, INC.,

       Defendant.

## DECISION AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DOC. 22)

Roundy's Supermarkets, Inc. discharged warehouse employee Michael Sarah on July 20, 2010. Teamsters "General" Local Union No. 200 ("Local 200") filed a complaint before the Wisconsin Employment Relations Commission, seeking to compel arbitration of the discharge grievance of union member Sarah. Roundy's removed the case to this court. Discovery is complete and Local 200 moves for summary judgment.

Roundy's contends that it could terminate Sarah under a provision excluding from arbitration discipline issued for engaging in an intentional slowdown or strike. Local 200 disputes Roundy's determination of its authority to instantly terminate Sarah and requests arbitration to answer the "threshold question" of whether a strike or slowdown actually occurred such that the exclusion applies. (Pl.'s Mot. for Summ. J. at 2.)

### SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the depositions, documents or electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers or other materials show that there is no genuine dispute of material fact and the moving party

is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of demonstrating it is entitled to summary judgment. *Celotex Corp.*, 477 U.S. at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend each element of the cause of action, showing that there is a genuine issue of trial. *Id.* at 322-24. In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

For purposes of Local 200's motion for summary judgment the parties submitted the following stipulated facts.

## STIPULATED FACTS

1. Defendant Roundy's Supermarkets, Inc., is an employer within the meaning of the Labor Management Relations Act of 1974 ("LMRA"), 29 U.S.C. §§ 142(3), 152(2), and is incorporated under Wisconsin law with its corporate headquarters located at 875 E. Wisconsin Avenue, Milwaukee, Wisconsin, 53202.

2. Plaintiff Teamsters Local Union No. 200 is a labor organization within the meaning of the LMRA, 29 U.S.C. §§ 142(3), 152(5).

3. Roundy's and Local 200 are parties to a collective bargaining agreement (the "Agreement") covering a unit of warehouse and transportation employees employed by Defendant at its Oconomowoc Division distribution center.

4. Article X of the Agreement is entitled No Strike – No Lockout.

5. Included in the parties' Agreement, at Article IV, is a dispute resolution procedure; that procedure culminates in final and binding arbitration.

2

6. Michael Sarah ("Sarah") began his employment with Defendant on February 24, 2003, as a warehouse selector.

7. His duties included selecting grocery product from Defendant's distribution center for delivery to various Defendant stores.

8. At the time his employment was terminated, and all times relevant to this action, Sarah was employed on the 2:00 p.m. to 10:30 p.m., perishable shift.

9. Selectors in the Oconomowoc Distribution Center, including Sarah, are contractually required to work at a minimum acceptable level of performance as measured by the Defendant's engineered standards program.

10. A selector's level of performance is rated by comparing the selector's actual performance on a specific store order to the standard established for the order. The engineered standard is calculated in minutes. Thus, each store order is assigned a standard, stated in minutes. In turn, the selector's actual performance on the order is stated in minutes.

11. A selector's weekly performance under the standards program is determined by comparing the aggregate standard minutes the selector worked to complete the store orders to which he was assigned during his workweek against the aggregate standard minutes established for orders the selector picked during his workweek.

12. A selector is required by Article VI, section 6.3 of the Agreement to meet the minimum acceptable level of performance, which is contractually set at 100% of the engineered standard.

13. A selector who performs below 100% of the standard and who does so without purpose or intent to harm Defendant is subject to progressive discipline, as provided in Section 6.3.

14. Conversely, a selector who with purpose and intent withholds production and does not meet the contractual standard of performance, 100%, is deemed by the Defendant to have engaged in conduct in violation of the No Strike/No Lockout provision set forth in Article X of the Agreement.

15. Selectors can determine their performance against standard during their workday by accessing their productivity record via computers in the warehouse that are provided for this purpose.

16. Selectors who perform above 100% of the standard receive incentive earnings in recognition of their performance.

17. During his employment, Sarah, on an annual basis, routinely achieved performance incentive earnings for productivity levels exceeding 100% of standard.

18. Defendant has the right, pursuant to its collective bargaining agreement with Local 200, to mandate that selectors work overtime on holidays.

19. July 4, 2010, was a holiday for which Defendant mandated overtime for certain selectors, including Sarah.

20. Sarah and the other selectors mandated for overtime work on July 4, 2010, were notified of the mandate on June 29, 2010.

21. Sarah had plans to attend a Dave Matthews Band concert on July 4, 2010, and, pursuant to this plan, had purchased tickets to the concert in advance.

4

22.  Sarah was upset that he was mandated to work overtime on the day he had planned to attend the Dave Matthews Band concert.

23.  For the week ending June 26, 2010, the week preceding notice to the Defendant concerning his mandated overtime on July 4, 2010, Sarah's performance rating was 102.9% of standard.

24.  After receiving his mandatory overtime assignment on June 29, 2010, Sarah's productivity was 61% of the standard for the week ending July 3, 2010.

25.  Sarah's productivity was 57.8% of the standard for the week ending July 10, 2010.

26.  Within the week ending July 10, 2010, Sarah's productivity rating for each day of the workweek was as follows: 81.17% on July 5, 2010; 59.81% on July 6, 2010; 51% on July 7, 2010; and 52.66% on July 8, 2010.

27.  In the past, employees have had performance levels below 50% for a week, but because the Company believed Sarah engaged in an intentional effort to diminish his productivity, the Company terminated his employment under Article X of the Agreement.

28.  Sarah failed to report to work on July 4, 2010, choosing instead to attend the Dave Matthews Band concert and receive a point under the Defendant's Attendance Program.

29.  On July 8, 2010, lead supervisor at Defendant's Distribution Center, Bob Walczak, had a conversation with Sarah concerning his poor performance.

30.  Walczak testified that during this conversation he asked Sarah why his production numbers were so low.

31.  Walczak testified that Sarah responded: "he was punishing the child."

32. Walczak further testified that Sarah explained to him that, "It's like if a child does something wrong, the parent punishes the child."

33. Walczak testified that in Sarah's analogy, Defendant was the child.

34. Walczak testified that he asked Sarah if his low productivity was purposeful. Walczak testified that Sarah responded "yes."

35. Sarah testified that he stated to Walczak: "How does a child act when they are wrongfully disciplined?" He testified that he also stated that his low performance following the mandate of July 4, 2010 overtime was "[n]ot premeditated, more of a physiological response."

36. Sarah testified that Walczak then asked him if his performance slowdown was purposeful, to which Sarah did not respond and walked away.

37. Sarah testified that, in his child-parent analogy, he was the "child" and Defendant was the "parent."

38. Sarah viewed being mandated to work overtime on July 4, 2010, when he had made plans to attend the Dave Matthews Band concert on that date, as punishment by Defendant.

39. Defendant believed that Sarah engaged in an intentional slowdown to inflict harm upon the Defendant's business interests as a direct response to the mandated July 4, 2010 overtime.

40. After investigation by Defendant's management, including Ed Kapitz, Director of Operations at Defendant's Oconomowoc Distribution Center, Sarah's employment was terminated by Defendant on July 20, 2010.

41. Defendant believed Sarah engaged in an intentional slowdown in violation of Article X of the parties' collective bargaining agreement, which forbids strikes, boycotts, and slowdowns, among other actions, whether engaged in by an employee individually or employees in concert.

42. Because Sarah's unacceptable productivity occurred over the period of two weeks – the weeks ending July 3 and July 10, 2010 – the Company determined that he could be immediately discharged under section 10.3 of Article X of the collective bargaining agreement.

43. Sarah is the only employee who has been discharged for a violation of Article X of the Agreement.

44. Plaintiff Local 200 grieved the termination.

45. Roundy's denied the grievance based upon its determination that Sarah's conduct violated Article X, and therefore Sarah had forfeited recourse to the parties' dispute resolution procedure based upon its interpretation of Section 10.3 of the contract.

46. By letter dated August 16, 2010, Local 200 advised Defendant of its intent to arbitrate Sarah's termination under Article IV of the Agreement.

47. Defendant maintains that arbitration under Article IV is unavailable to Sarah because Article X, Section 10.3 of the Agreement provides that an employee who has violated the no-strike provisions of that Article "shall not be entitled to, or have any recourse to, any other provision in the Agreement."

The court adds the following to the above stipulations, for clarity. The CBA (attached to the stipulated facts) provides that "[s]hould any differences, disputes or complaints arise over the interpretation or application of the contents of this Agreement,

there shall be an earnest effort on the part of both parties to settle such promptly through" three steps. (Doc. 21 Ex. A § 4.1.) Steps one and two involve discussions with an immediate supervisor and then submission of the grievance to the Director of Operations. (*Id.*) Then, at step three of the grievance process, "[d]isagreements which cannot be amicably settled shall be submitted to arbitration." (*Id.*; *see id.* § 4.3(a).) Regarding arbitration, the CBA provides that the power and authority of the arbitrator are limited "[t]o a determination of whether this Agreement has been violated by the Employer, and assuming such violation is found, a determination as to the appropriate remedy for such violation." (*Id.* § 4.3(b)1.) "The arbitrator shall consider and decide only the particular issue(s) presented to him . . . ." (*Id.* § 4.3(b)3).)

In section 10.1 of the CBA the Union agreed that there would be "no strike, boycotts, corporate campaigns against the Employer and/or its customers, concerted slowdowns, or sit-downs or stoppages of any kind whatsoever, or any other interference with or interruption of the normal conditions of the Employer's business by the Union or its members, either collectively or individually." Section 10.3 then provides:

> After the first twenty-four (24) hour period of such stoppage, the Employer may immediately discharge any Union members participating in any unauthorized strike, slowdown, walkout or any other unauthorized cessation of work, and such Union members shall not be entitled to, or have any recourse to, any other provision of this Agreement.

(*Id.* §§ 10.1, 10.3.)

Finally, Articles V and VI govern progressive disciplinary measures and discharge for substandard productivity. (*Id.* arts. V, VI.)

8

Case 2:11-cv-00195-CNC   Filed 09/14/12   Page 8 of 13   Document 25

ANALYSIS

Federal courts recognize the "liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1745 (2011) (citation and internal quotation marks omitted). Because arbitration is a matter of contract, a party cannot be forced to arbitrate any dispute that it has not agreed to arbitrate. *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002); *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960). Arbitration agreements are treated like other contracts; they are enforced according to their terms. *Concepcion*, 131 S. Ct. at 1745.

It is helpful to distinguish the three layers of disagreement in this case, as the Supreme Court did in *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 942 (1995). First, the parties disagree about whether Sarah's conduct was an unauthorized slowdown such that section 10.3 applied and Roundy's could fire him without going through the usual disciplinary steps. Second, they are at odds as to whether they agreed to arbitrate the first matter. Then the third layer is who should decide the second matter. *See id.* Different presumptions apply as the layers are peeled back. *Id.* at 944-45.

Whether parties agreed to submit a particular dispute to arbitration is a question to be decided by the court unless the parties clearly and unmistakably have stated otherwise. In other words, there is no presumption that the parties agreed to arbitrate arbitrability—instead, there must be clear and unmistakable evidence that they so agreed. *Id.*; *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986). Silence on the matter means the court decides. *See First Options of Chi., Inc.*, 514 U.S. at 944-45. And in deciding whether the parties have agreed to submit a particular grievance to

9

arbitration, the court should not rule on the merits of the underlying matter. *At&T Techs., Inc.*, 475 U.S. at 649.

Here, there is no clear and unmistakable evidence that an arbitrator should decide arbitrability. Instead, the opposite is true. The CBA limits the power and authority of the arbitrator when deciding a grievance (such as a grievance that Sarah was wrongfully terminated) "[t]o a determination of whether this Agreement has been violated by the Employer" and specifies that the arbitrator shall consider only that issue. (Doc. 21 Ex. A § 4.3(b)1, 3.) So this court will decide the next layer, which is the center of the parties' dispute here: must the parties arbitrate whether Sarah's conduct fell within section 10.3?

As to this question the presumption reverses. *See First Options of Chi., Inc.*, 514 U.S. at 945. Inclusion of a broad arbitration clause in an agreement creates a presumption of arbitrability. *See id*. If the parties have agreed to arbitrate some matters, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. *See Granite Rock Co. v. Int'l Bhd. of Teamsters*, 130 S. Ct. 2847, 2857 (2010). A court may not deny a party's request to arbitrate an issue "'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *AT&T Techs., Inc.*, 475 U.S. at 650 (quoting *Warrior & Gulf Navigation Co.*, 363 at 582-83). Overcoming the presumption generally takes an express provision excluding a matter from arbitration or "the most forceful evidence of a purpose to exclude the claim from arbitration." *Warrior & Gulf Navigation Co.*, 363 U.S. at 584-85.

The primary CBA language relating to this second layer is in Article IV, the arbitration provisions. The CBA states that if any disputes arise "over the interpretation or application of the contents" of the agreement, then the parties proceed through three steps,

10

the last of which is arbitration. (Doc. 21 Ex. A § 4.1.) The dispute over whether section 10.3 applies in Sarah's case is a dispute over whether the CBA applies. Whether Sarah was terminated in accord with or in violation of the CBA is within the arbitrator's power and authority under Article IV. (*See id.* § 4.3(b).)

Article X does not clearly change the application of sections 4.1 and 4.3 to the grievance over Sarah's termination. Although section 10.3 permits Roundy's to discharge any union member participating in an unauthorized slowdown or cessation of work and states that "such Union members shall not be entitled to, or have any recourse to, any other provision of this Agreement," it does not expressly state that Roundy's gets to determine whether section 10.3 applies. Nor does the court see any other evidence of a purpose to exclude the claim from arbitration. The court cannot say with positive assurance that questions over whether section 10.3 applies are excluded from the scope of the arbitration sections. A reasonable interpretation of Articles IV and X together is that the arbitration clause covers the underlying dispute but that once an employee is found by the arbitrator to have violated section 10.3 then the progressive disciplinary measures of Articles V and VI and any other protections of the CBA do not apply. And any contractual ambiguity is resolved by adhering to the presumption of arbitrability.

Roundy's argues that section 10.3 of the CBA excludes this matter from arbitration completely because Sarah committed an intentional slowdown. But why would Roundy's get to determine whether Sarah committed an intentional slowdown? Consider an "innocent" employee, i.e., one who truly did not intend to commit a slowdown. If Roundy's could unilaterally call the employee's conduct intentional and apply section 10.3, then an innocent employee would lose protections under the CBA to which he or she is entitled.

11

The reasonableness of the interpretation above—that an arbitrator should decide whether an intentional slowdown occurred—is highlighted in such a situation. Moreover, Roundy's framing of the exclusion from arbitration presupposes that the person terminated violated section 10.3, when dispute of such occurrence may be the heart of the grievance.[1]

*Local 73, Service Employees International Union v. UChicago Argonne, LLC*, No. 10 C 2903, 2011 WL 635862 (N.D. Ill. Feb. 11, 2011), is right on point. In that case, the union and employer entered into a last chance agreement for employee Gleason, providing that if Gleason engaged in any future violations of the employer's personal protective equipment (PPE) requirements and was terminated for those violations, Gleason and the union waived all rights under a collective bargaining agreement to arbitrate the termination. After the employer terminated Gleason for violation of the PPE rules, the union filed a grievance and sought arbitration, but the employer refused.

In federal court, the union contended that arbitration was required regarding whether Gleason actually violated the PPE rules. District Judge Kocoras agreed: "The waiver language clearly precludes Local 73 or Gleason from arbitrating Gleason's termination if the preconditions listed are met. But the text does not clearly assign responsibility to any party for determining whether a violation occurred in the first place nor does it expressly exclude a dispute over that determination from arbitration." *Id.* at *3. The court found the grievance to be arbitrable.

---

[1] As Roundy's puts it, "[a] grievance protesting the grievant's termination for participation in an Article X prohibited activity is not subject to the arbitration process. Sarah violated the no strike pledge. He intentionally and with purpose deprived the Employer of his labor. This is a classic slowdown, work stoppage or other interference with the Employer's business. Each of these activities is expressly prohibited by Article X." (Doc. 23 at 13-14.) But phrasing the matter that way improperly avoids the question whether Sarah violated the no strike pledge in the first place.

12

Similarly here, the question whether the precondition to Sarah's termination was met must be arbitrated. It the arbitrator determines that Sarah's conduct fell within section 10.3, then Roundy's decision to terminate him will stand and Sarah and the union will have no recourse. If the arbitrator determines that Sarah's conduct did not fall within section 10.3, then the discipline may be otherwise challenged. But the finding of the precondition to termination is for the arbitrator, not Roundy's or this court.

For these reasons,

IT IS ORDERED that plaintiff's motion for summary judgment is granted (Doc. 22), and the parties are directed to arbitrate.

As a final matter, Local 200 asks that Roundy's be sanctioned for seeking to avoid its contractual obligations and delaying and increasing the cost of this matter. (*See* Reply at 5-6.) It asks for costs and attorneys' fees for this case. Because the parties have a bonafide dispute, the court sees no sufficient basis in the record for sanctioning Roundy's or awarding attorney's fees. Therefore,

IT IS ORDERED that Local 200's request for sanctions or attorney's fees is denied. However, costs may be awarded in the usual course following judgment.

Dated at Milwaukee, Wisconsin, this 14th day of September, 2012.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U. S. DISTRICT JUDGE

13